**Mentor Lumber & Supply Co. v. Victor**
*[Cite as 8 AOA 640]*

*Case No. 89-L-14-103*
*Lake County, (11th)*
*Decided December 31, 1990*

Patrick J. Perotti, 153 E. Erie Street, Painesville, Ohio 44077, for Plaintiff-Appellee.

Timothy P. Cannon, 41 East Erie Street, Painesville, Ohio 44077, for Defendants-Appellants.

CHRISTLEY, P.J.

In December 1985, appellant's son, Reed Victor, opened an account with appellee, Mentor Lumber and Supply Co., and operated a sole proprietorship d.b.a. Johnnycake Homes. In 1986, appellant, Ralph Victor, and his son incorporated under the name Reed Victor, Inc., d.b.a. Johnnycake Homes. (Appellant testified that the incorporation was a result of his son experiencing marital problems.) Reed Victor, Inc. was formed with Ralph Victor being a fifty percent shareholder, a director, an officer and an authorized signatory on the corporate checking account. The shares were returned to appellant 's son in 1987 with no consideration passing to appellant. (The marital problems have been resolved.) A number of construction loans were obtained by appel-lant's son through Security Federal Savings and Loan Association, with appellant as cosignor. Appellant also loaned his son's corporation $200,000. The loan was secured by two lots on which model homes were built.

In October 1987, appellee called a meeting with appellant and his son concerning the corporation's outstanding balance due on its account with appellee. (There was a large amount owed and Reed Victor's check for the October payment [$10,000] was returned due to "non-sufficient funds.") Another meeting was held in November 1987, and a representative of appellee, Robert Sanderson, testified that appellant agreed to "stand behind" his son's account. Finally, at a meeting held on February 6, 1988, appellee required the account to be brought up to date, otherwise deliveries of materials would cease. The possibility of mechanic's liens were also discussed. At the end of the meeting, appellant made a payment on the account in the amount of $32,953.62. Evidence was presented that the corporation was indebted to appellant for $178,000 at the time of the November 1987 meeting and remained indebted for $67,000 at the time of the February 1988 meeting. At this time, appellant no longer cosigned construction loans for his son. Appellant did, however, subordinate his interest in one of the model homes to Security Federal Savings and Loan Association's claim for $70,000. (In the end, appellant's interest in the two model homes was possibly undersecured. The subordinated interest on Sublot 13 Hallmark Manor subdivision home was sold for $95,000 minus Security Federal's $70,000 priority interest, leaving on $25,000 to secure appellant's interest. However, there was evidence that by February the debt was reduced to $67,000 and a model home was almost completed on the second lot securing appellant's interest.)

After the February 6, 1988 meeting, appellee continued to supply additional materials to the corporation in the amount of $49,158.56. In March 1988, appellant's son left town with his family and their whereabouts are unknown. (It appears that the trial court placed a great emphasis on a phone conversation, occurring at this time, between Mr. Sanderson and appellant's wife, in which she allegedly reiterates a guarantee of the son's business. However, the questioner withdrew those questions concerning this fact. Furthermore, this court would seriously question the wife's ability to personally bind her husband to such a guarantee.)

Appellee then filed mechanic's liens against the corporation's projects for the balance owed. These filings named only appellant's son, Reed Victor, as the debtor. At the same time, appellant took control of the projects under construction and the liquidation of the corporation's assets. There remained an outstanding balance due with appellee of $111,365.71.

Appellee brought suit, naming appellant as a party and alleging that he had personally guaranteed the payment of the corporation's account with appellee. The trial court found that the "leading object" of the promise was appellant's own pecuniary interest (based on the corporation's indebtedness to appellant and appellant's liability as cosignor on many of the corporation's loans and removed the oral promise to answer for his son's debts from the statute of frauds), thereby finding appellant jointly and several-

ly liable to appellee for damages in the amount of $111,365.71.

It is from this judgment that appellant timely appeals raising the following assignments of error:

"1. The trial court erred in ruling that defendant, Ralph Victor, had (1) made a personal guarantee to pay the debt of Reed Victor to Mentor Lumber and Supply Co., and (2) that he agreed to become primarily liable on the account.

"2. The trial court erred in failing to grant defendant's motion for directed verdict at the close of plaintiff's case and in granting judgment for plaintiff at the conclusion of the case, as plaintiff had failed to establish the requirements of the 'leading object rule.'

"3. The trial court erred in granting judgment in favor of the plaintiff for amounts due on Reed Victor's account prior to the alleged promise of Ralph Victor on February 6, 1988."

In his first assignment of error, appellant contends that the trial court erred in removing the oral guarantee from the protection of the statute of frauds because the promise was not unequivocal. Appellant's position is that the language "stand behind" his son's account is subject to more than one interpretation; therefore, the promise is not unequivocal and deserves the protection of the statute of frauds.

Appellant cites *Continental Supply Inc. v. Wilson Covey d.b.a Covey Plumbing* (Jan. 13, 1986), Warren App. No. CA85-06-036, unreported, which stated that the trial court found no unequivocal promise to answer for another's debt, and, therefore, the promise came under the protection of the statute of frauds.

This court agrees with appellant's contention that something less than an unequivocal promise was made to appellee. Appellee admits that "stand behind" could have meant only that Ralph Victor would help his son with the business and that appellant would see to it that projects were finished.

There were notations made at these meetings when the promise to "stand behind" Reed Victor, Inc. was made. However, a guarantee is not mentioned in these notations. Finally, appellee's general manager, who knew that a writing was required, stated that he told appellant that a handshake would be good enough and that no writing was needed.

No unequivocal promise to answer for the debt of another was made and, therefore, the requirements of the statute of frauds must be met before such a "guarantee" will be enforced against the promisor. As such, appellant's first assignment of error is with merit.

In his second assignment of error, appellant contends the trial court erred in denying appellant's motion at the close of appellee's case. and that the trial court erred in finding for the appellee, as appellee failed to establish the "leading object" of appellant's promise.

Appellee correctly argues that appellant's motion for a directed verdict should properly be entitled a motion for involuntary dismissal under Civ. R. 41(B)(2). See *Lentino v. Fringe Emp. Plans, Inc.* (C.A. 3, 1979), 611 F. 2d 474. Appellee then relies upon *Helmick v. Republic-Franklin Ins. Co.* (1988), 39 Ohio St. 3d 71, for the proposition that appellant having failed to renew his motion at the end of the trial any error has been waived by appellant. *Helmick, supra,* deals with a motion for directed verdict in a jury trial and is inapplicable. It has been already stated that appellant's motion should be considered a motion for involuntary dismissal under Civ. R. 41(B)(2).

*Janell, Inc. v. Woods* (1980), 70 Ohio App. 2d 216, 217, is determinative of this issue as the court states:

"The language of the single assignment asserts error in failing to direct a verdict in favor of Fox Berry at the close of all the evidence. Since the trial was before a referee without a jury, defendant made the wrong motion. The proper motion would have been one for dismissal under Civ. R. 41 (B) (2), made at the close of the plaintiff's case. *** Civ. R. 41(B)(2) allows the trial court to determine the facts by weighing the evidence and to render judgment against the plaintiff at the close of plaintiff's case, or, in the alternative, to decline to render any judgment until the close of all the evidence. The trial court's dismissal of the case will not be set aside unless erroneous as a matter of law or against the manifest weight of the evidence. The court's deferral of its judgment will not be set aside unless shown to be an abuse of discretion. A *renewal* of the motion to dismiss

at the close of all the evidence has no real meaning because the disposition of the case will then be made on all the evidence.

"We deem the assignment of error to be that the court's judgment at the close of all the evidence was contrary to law or against the manifest weight of the evidence." (Citations omitted, emphasis in original.)

This court must determine if the trial court's determination of appellant's "leading object" is against the manifest weight of evidence as such a determination is a finding of fact. See, *Thomas A. Armbuster, Inc. v. Banon* (Pa. Sup., 1985), 491 A 2d 882. This court finds the logic of *Armbuster* persuasive and in line with Ohio case law such as *Dunn v. Rostock* (1944), 74 Ohio App. 311, which held the determination of a collateral promise is one of fact and not one of law.

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St. 2d 279, syllabus. Accord *Frankenmuth Mut. Ins. Co. v. Selz* (1983), 6 Ohio St. 3d 169.

Those facts which the trial court relied upon in determining appellant's "leading object" are as follows:

"Appellant's involvement as a director, officer, authorized signature and as a formed 50% shareholder [involvement is minimal at best].

"Appellant's liability as co-signor [*sic*] on construction loans to the corporation.

"The corporation's indebtedness to appellant [substantially reduced prior to alleged guarantee].

"Appellant's reputation in the community as a reputable businessman and possible damage there to [for this, no evidence was presented, and therefore, no competent credible evidence to support it]."

While there is some competent, credible evidence as to some financial connection, the trial court's finding of "leading object" is against the manifest weight of evidence. Numerous cases allow an oral guarantee to be removed from the protection of the statute of frauds when the promisor's own pecuniary interests are the "main purpose" or "leading object" behind the promise, regardless of whether the original obligor remains liable upon the debt. *Crawford v. Edison* (1887), 45 Ohio St. 239; *Wilson Floors Co. v. Sciota Park Ltd.* (1978), 54 Ohio St. 2d 451; *Builder Appliance Supply Inc. v. Hughes* (1983), 13 Ohio App. 3d 207; *Drake, Phillips, Kuenzli & Clark v. Skundor* (1986), 27 Ohio App. 3d 337.

However, these "leading object" cases demonstrate one marked difference with the facts of this case and that is the leading object is much more direct. The leading object in this case appears to be too attenuated, and the protection of the statute of frauds should not be so diminished.

The trial court's holding finds appellant's leading object to assume over $100,000 worth of unsecured or undersecured debts to be appellant's own financial interests in his son's corporation. The underlying security for the corporate indebtedness to appellant no longer appears to be sufficient to the trial court. However, the first model home was sold for $95,000 and while the second model home may not be identical, it most likely would have adequately secured the remaining $67,000.

It should also be noted that appellant would not have been in what the trial court judged to be a precarious position, if appellant had not subordinated his interest to Security Federal. By doing this, appellant created equity which the corporation borrowed against and applied the funds to the outstanding balance owed to appellee. It does not seem plausible that this would then become appellant's leading object for guaranteeing the account's balance.

The trial court decided that if appellee stopped supplying material and filed mechanic's liens, then no one would supply material or credit and the corporation's projects would come to a stop. Homes would not be finished and construction loans which appellant had cosigned would be foreclosed.

Fearing this secondary liability, appellant "guarantees" an undersecured account in excess of $100,000. (Evidence was presented concerning numerous unpaid creditors of the corporation, but there is no evidence that appellant would be required to answer to any of these other creditors.)

It is true that appellant attended the meetings, but at appellee's request. It is true that appellant made a payment on the account. However, it is also true that the account was that of appellant's son.

Appellee had as much, if not more, of a vested interest in the continuation of Reed Victor, Inc. (The corporation may have supplied an additional $49,000 worth of supplies, but the amount owed on the account was reduced over $50,000.) As the houses near completion, the expectation of returns also draws closer, while the required outlay of capital by suppliers diminishes greatly.

As the facts in this case fail to demonstrate a substantial pecuniary interest directly tied to appellant's oral "guarantee," the trial court erred in finding a "leading object," removing the protection of the statute of frauds. As such, appellant's second assignment of error is with merit.

In his third assignment of error, appellant contends that if he is found liable, then he should only be liable for the amount of supplies advanced after his guarantee, specifically that amount after the meeting of February 6, 1988.

While the determination of appellant's first and second assignments of error renders this assignment unnecessary, the proposition merits attention.

Appellant argues that the law of contracts still governs the outcome of this case, and that a contract lacking consideration is unenforceable. Appellant contends that the prior debt of the corporation will not act as consideration and, therefore, appellant should not be liable for this prior debt.

Research failed to uncover Ohio case law determinative of this issue, but case law from other jurisdictions holds that *any* consideration will support guarantees for previous, as well as future debts.

"Where, however, a guarantee expressly covers past and future transactions and is supported by a consideration arising out of the future transactions, it is good as to the whole." 38 C.J.S., Guaranty 26, p 1165. See, also, *Gibbs v. American Nat'l Bank of Jacksonville* (Fla., 1963), 155 So. 2d 651; *Gem Metal Specialties v. Active Wire & Metal Prod. Corp.* (1960), 198 N.Y.S. 2d 528; *Kennedy v. Joy Manufacturing* (1986), 707 S.W. 2d 362.

The guarantee was supported by the consideration of appellee continuing to supply materials in excess of $49,000. This consideration would have sufficed to support the guarantee of both the future debts and the previous debts of the corporation, if not for the protection of the statute of frauds. As

such, appellant's third assignment of error is without merit.

While this court granted the motion for reconsideration and a slight modification of our original opinion resulted, the rationale of that opinion still holds true.

The decision of the trial court is reversed and remanded for further proceedings consistent with this opinion.

MAHONEY, J. and PRYATEL, J., concur.

PRYATEL, J., retired, Eighth Appellate District, sitting by assignment.